

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

MICHAEL C. HILD,
    Plaintiff,

v.

                                     Civil Action No. 3:25-cv-01050-DJN

                                     Hon. David J. Novak

DAN FOSTER;
GLEN HADDOCK;
LAWRENCE "LARRY" MATTERA, JR.;
CHRISTOPHER KRUPA;
BLOOMBERG L.P.;
ICE DATA PRICING & REFERENCE DATA LLC
  (f/k/a Interactive Data Pricing and Reference Data LLC;
  converted from Interactive Data Pricing and Reference Data, Inc.);
INTERCONTINENTAL EXCHANGE, INC.;
INDUSTRIAL AND COMMERCIAL BANK OF CHINA FINANCIAL SERVICES LLC;
MIRAE ASSET SECURITIES (USA) INC.;
FLAGSTAR BANK, FSB;
CUSTOMERS BANK; and
DOES 1–50,

    Defendants.

---

**JURY TRIAL DEMANDED
FIRST AMENDED COMPLAINT
FOR DAMAGES AND EQUITABLE RELIEF
(Virginia Business Conspiracy – Va. Code §§ 18.2-499, 18.2-500)**

---

**I. PARTIES**

1. Plaintiff Michael C. Hild is a resident of Virginia and brings this action in his individual

1

capacity for direct, non-derivative injuries he personally suffered and continues to suffer.

2. Plaintiff does not assert claims belonging to Live Well Financial, Inc. ("Live Well"), its bankruptcy estate, or any trustee-owned causes of action.

3. Plaintiff seeks recovery solely for personal injuries, including lost contractual guarantee-fee income, loss of future earning capacity, restitution-related enforcement harm, reputational and professional destruction, and other consequential damages, including direct personal economic injury associated with the loss in value of Plaintiff's personally held equity and contractual economic interests, as further alleged below.

4. Defendant Dan Foster is a natural person whose conduct caused direct injury to Plaintiff in Virginia.

5. Defendant Glen Haddock is a natural person whose conduct caused direct injury to Plaintiff in Virginia.

6. Defendant Lawrence "Larry" Mattera, Jr. is a natural person whose conduct caused direct injury to Plaintiff in Virginia.

7. Defendant Christopher Krupa is a natural person whose conduct caused direct injury to Plaintiff in Virginia.

8. Defendant Bloomberg L.P. publishes and disseminates financial data and pricing information purposefully directed into Virginia.

9. Defendant ICE Data Pricing & Reference Data LLC (f/k/a Interactive Data Pricing and Reference Data LLC; converted from Interactive Data Pricing and Reference Data, Inc.) ("ICE Data" or "IDC") is a pricing-services entity that provided pricing data and related valuation information for mortgage-related bonds, including HREMIC interest-only ("HREMIC IO") bonds, and whose pricing outputs—whether derived from evaluated

pricing methodologies, broker quotes, or other pricing inputs—were designated and/or used as operative pricing sources under the relevant repo and lending agreements and related custodial and pricing-reporting processes.

10. Defendant Intercontinental Exchange, Inc. ("ICE") is the corporate parent and enterprise owner of the ICE Data Services business, within which IDC operated at all relevant times; ICE owned, controlled, marketed, and benefited from the pricing services at issue.

11. Defendant Industrial and Commercial Bank of China Financial Services LLC ("ICBCFS") is a U.S.-based broker-dealer and market participant whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

12. Defendant Mirae Asset Securities (USA) Inc. is a U.S.-based broker-dealer and market participant whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

13. Defendant Flagstar Bank, FSB is a federally chartered savings bank whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

14. Defendant Customers Bank is a Pennsylvania-chartered bank whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

15. Defendants Does 1–50 are persons or entities who participated in or benefited from the unlawful conduct alleged herein.

## II. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because Plaintiff Michael C. Hild is a citizen of the Commonwealth of Virginia, no Defendant is a citizen of Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and

3

costs.

17. In the alternative, this Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims necessarily raise substantial and disputed issues concerning securities pricing, broker-dealer duties, and market-data publication.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims.

19. This Court has personal jurisdiction over Defendants because they purposefully directed conduct into Virginia causing injury here.

20. Venue is proper in this District under 28 U.S.C. § 1391(b).

## III. PERSONAL GUARANTEES AND INDEPENDENT ECONOMIC INTERESTS

21. Over a period exceeding fifteen years, Plaintiff personally guaranteed key credit facilities of Live Well, including the Flagstar warehouse line and the Customers Bank credit facility, as well as other material obligations.

22. Certain facilities, including the Mirae repo agreement and the ICBC repo agreement, were not directly guaranteed by Plaintiff. The Flagstar commercial bond facility was extended pursuant to separate credit documentation that did not include an express personal guarantee by Plaintiff; however, Flagstar has asserted— and Plaintiff disputes— that a prior guarantee executed in connection with an earlier warehouse line agreement extended to later-created obligations, including the bond facility.

23. All material credit facilities were subject to cross-default provisions, such that a default under any facility automatically triggered defaults under all facilities.

24. As a result, a default declared by any lender—whether or not its facility was directly

guaranteed—automatically exposed Plaintiff to personal liability under facilities he had guaranteed.

25. Defendants knew of these cross-default mechanics and knew that inducing default would foreseeably cause direct personal harm to Plaintiff.

26. In connection with his guarantees, Plaintiff entered into separate contractual guarantee-fee agreements with Live Well.

27. Guarantee-fee income was independent of salary or employment compensation and constituted a substantial portion of Plaintiff's livelihood.

28. Defendants Flagstar Bank, FSB; Customers Bank; Industrial and Commercial Bank of China Financial Services LLC; and Mirae Asset Securities (USA) Inc. (collectively, the "Lender Defendants"), together with Defendant Glen Haddock, knew that forcing Live Well into default and bankruptcy would terminate Plaintiff's guarantee-fee income and expose him to personal liability under guaranteed facilities. The remaining Defendants knew or reasonably should have known that the coordinated pricing conduct alleged herein would foreseeably cause defaults, cross-defaults, and cascading enforcement actions resulting in direct personal economic injury to Plaintiff.

29. In connection with Live Well's credit facilities, Plaintiff was required to provide personal financial statements and audited financial statements to the Lender Defendants, which disclosed Plaintiff's receipt of substantial personal guarantee-fee income arising from his separate contractual arrangements with Live Well. As a result, the Lender Defendants had actual knowledge of Plaintiff's personal contractual income streams and knew or should have known that inducing defaults, cross-defaults, or bankruptcy would foreseeably terminate those payments and cause direct personal economic injury to Plaintiff.

## IV. DISCOVERY AND CONCEALMENT

30. Until in or about April 2021, Plaintiff had no information indicating that pricing supplied by Defendant Dan Foster, a criminal cooperator with the government, was being used as a substitute pricing source to justify defaults and enforcement actions against Live Well.

31. In or about April 2021, Plaintiff first received a single, fragmentary prosecutorial note suggesting that Dan Foster had supplied pricing inputs to a market-data publisher.

32. That disclosure did not reveal the scope, mechanics, participants, or duration of the coordinated pricing conduct.

33. Plaintiff did not obtain pricing datasets, submission histories, custodial substitution mechanics, or relevant communications until very recently.

34. Defendants' conduct and its effects continued after April 2021 and into the present.

## V. PRICING MECHANISM AND OPERATIONAL SUBSTITUTION

35. The governing repo and lending agreements expressly designated Interactive Data Corporation, now operating through and succeeded by ICE Data Pricing & Reference Data LLC ("IDC"), as the pricing source for the bonds, including HREMIC interest-only ("HREMIC IO") bonds.

36. While IDC continued to provide pricing for the bonds, lenders and counterparties relied upon that pricing for valuation, margining, and related enforcement purposes.

37. IDC subsequently ceased pricing Live Well's bonds and posted null or no values for those instruments.

38. The governing agreements did not designate Bloomberg, or any other alternative pricing provider, as a successor or backup pricing source in the event IDC ceased providing

prices.

39. Nevertheless, valuation of the bonds continued to occur for margining, default, and enforcement purposes after IDC ceased providing pricing.

40. During that period, Bloomberg pricing for the bonds existed and became available through Bloomberg's data services, including pricing inputs supplied to Bloomberg by Defendant Dan Foster.

41. While IDC continued to provide pricing, Bloomberg prices were not reflected on third-party pricing reports, were not relied upon by Live Well or its lenders, and were not operative for margining, default, or enforcement decisions.

42. After IDC ceased providing prices and posted null or no values, third-party pricing reports generated by U.S. Bank, as securities custodian, automatically defaulted to Bloomberg pricing when IDC values became unavailable.

43. As a result of that operational default within U.S. Bank's reporting systems, Bloomberg pricing—previously existing in the background—became visible and operative for valuation and enforcement purposes.

44. On information and belief, pricing inputs supplied by Defendant Dan Foster caused Bloomberg to generate and publish prices for HREMIC IO bonds, including HREMIC IO bonds held by Live Well, once IDC ceased providing pricing.

45. Bloomberg L.P. knew that the pricing inputs it purchased, incorporated, and published for mortgage-related bonds, including HREMIC interest-only ("HREMIC IO") bonds, would be used by market participants, securities custodians, and lender counterparties for valuation, margining, default determination, and enforcement purposes, because such uses constitute the ordinary, intended, and commercially marketed functions of

Bloomberg's pricing data products within the institutional fixed-income markets. Bloomberg sold, licensed, and disseminated such pricing data to sophisticated financial institutions precisely for those operational purposes and knew that its published prices would be relied upon as actionable inputs in credit, collateral, and enforcement decisions.

46. Following IDC's cessation of pricing, the Lender Defendants relied upon Bloomberg pricing—whether accessed through U.S. Bank's third-party pricing reports, directly from Bloomberg's data services, or through a combination of both—as operative pricing data for valuation, margining, default, and enforcement decisions.

47. The immediate and uniform reliance by multiple sophisticated Lender Defendants on Bloomberg pricing following IDC's cessation occurred without delay, divergence, or evident uncertainty, notwithstanding that Bloomberg had not been designated as a pricing source in the governing agreements.

48. Based on that reliance, the Lender Defendants issued margin calls, declared defaults, triggered cross-defaults, forced Live Well into bankruptcy, terminated Plaintiff's guarantee-fee income, and set in motion the cascading harms alleged herein.

## VI. GLEN HADDOCK'S KNOWLEDGE AND CONDUCT

49. Defendant Glen Haddock was responsible for supplying Live Well's pricing inputs to IDC.

50. Haddock possessed detailed knowledge of how IDC pricing functioned contractually and operationally.

51. Haddock knew that IDC's cessation of pricing would result in Bloomberg pricing automatically appearing on U.S. Bank's third-party pricing reports based on prior

experience and inquiry.

52. Haddock knew that the appearance of Bloomberg pricing on U.S. Bank's reports would result in immediate valuation write-downs, margin failures, covenant breaches, and collapse.

53. Through communications with Defendant Christopher Krupa, Haddock had advance knowledge of the date on which IDC would cease pricing.

54. Immediately prior to that known event, Haddock refused to sign Live Well's financial statements, conduct inconsistent with ordinary practice and reflective of contemporaneous knowledge of the impending collapse.

55. Haddock prepared, oversaw, or directed the preparation of monthly pricing spreadsheets used to supply bond valuations to IDC.

56. In sworn testimony, Haddock acknowledged that, after communications concerning IDC's pricing role, he learned that the bond marks "had not changed" and that the spreadsheet transmitted to IDC "appeared to be just being re-dated and sent month over month."

57. Haddock further acknowledged that the marks reflected on that spreadsheet remained static across multiple reporting periods.

58. On information and belief, Haddock created, controlled, or directed the monthly pricing spreadsheet process and caused static bond marks to be submitted to IDC for multiple months prior to IDC's cessation of pricing.

59. Independently of the Lender Defendants' enforcement actions, Defendant Glen Haddock relied upon Bloomberg pricing reflected on U.S. Bank's third-party reports to write down the value of Live Well's bond portfolio by approximately fifty percent, an action that

immediately precipitated margin failures, covenant breaches, and the cascading defaults described herein.

60. These facts are inconsistent with any claim that Haddock lacked awareness of the pricing mechanics or the stability of the marks being supplied to IDC and further support Haddock's contemporaneous knowledge of the pricing process and the foreseeability of the collapse that would occur once IDC ceased posting values and operational substitution through custodian pricing was triggered.

## VII. DAMAGES AND CONTINUING INJURY

61. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered compensatory damages exceeding $900,000,000, including (among other things) the destruction of Plaintiff's contractual guarantee-fee income stream and other compensation tied to his personal performance and guarantees; the triggering and enforcement of cross-defaulted personal guarantees and related personal liability exposure; severe and ongoing reputational and professional harm and resulting loss of future earning capacity; and continuing restitution-related enforcement harms premised on loss calculations derived from the same distorted pricing. Plaintiff further suffered substantial loss in the value of his personally held equity and contractual economic interests associated with Live Well and its anticipated growth trajectory, which are alleged here only to the extent they constitute direct, personal economic injury to Plaintiff, and not as derivative claims belonging to Live Well or any bankruptcy estate. These compensatory damages are subject to trebling under Va. Code § 18.2-500, resulting in total damages exceeding $2.7 billion, exclusive of interest, costs, and equitable relief.

62. Defendants' conduct terminated Plaintiff's guarantee-fee income.

63. Defendants' conduct exposed Plaintiff to personal liability under guaranteed facilities.

64. Defendants' conduct destroyed Plaintiff's controlling ownership interest in Live Well and its anticipated growth trajectory.

65. Plaintiff became subject to restitution obligations and ongoing enforcement premised on loss calculations derived from the same distorted pricing.

66. Plaintiff's assets and financial resources were frozen, seized, or rendered inaccessible.

67. Restitution enforcement operates as a continuing and lifelong economic disability.

68. Plaintiff suffered severe reputational and professional harm, including permanent exclusion from financial services and loss of ordinary banking access.

69. Defendants' conduct and its effects continue into the present.


## VIII. CAUSES OF ACTION

### Count I – Virginia Business Conspiracy

### (Va. Code §§ 18.2-499 and 18.2-500)

70. Defendants combined and agreed to willfully and maliciously injure Plaintiff in his trade, business, and profession.

71. Defendants employed improper methods, including coordinated pricing cessation, operational substitution of Bloomberg pricing through custodian reporting systems, and reliance on that pricing to enforce defaults.

72. Defendants committed overt acts in furtherance of the conspiracy in Virginia.

73. Plaintiff suffered direct personal injury as a result.

## Count II – Common-Law Civil Conspiracy

74. Defendants agreed to accomplish unlawful purposes and used unlawful means.

75. Defendants committed overt acts causing direct injury to Plaintiff.

## Count III – Tortious Interference with Contract

76. Plaintiff had valid contractual relationships, including guarantee-fee agreements.

77. Defendants knew of those contracts.

78. Defendants intentionally interfered through improper methods.

79. Plaintiff suffered damages.

## Count IV – Tortious Interference with Business Expectancy

80. Plaintiff had reasonable business expectancies.

81. Defendants knew of and interfered with those expectancies.

82. Plaintiff suffered damages.

## Count V – Aiding and Abetting

### (Bloomberg L.P. and Intercontinental Exchange, Inc.)

83. Primary violations were committed by co-defendants.

84. Bloomberg and ICE knowingly provided substantial assistance by publishing and enabling substituted pricing.

85. Plaintiff suffered damages as a result.

## Count VI – Unjust Enrichment

86. Defendants Bloomberg L.P., Intercontinental Exchange, Inc., ICE Data Pricing & Reference Data LLC, and the Lender Defendants received substantial benefits at Plaintiff's expense as a result of the conduct alleged herein, including financial recoveries, enforcement leverage, loss shifting, and avoidance of market and credit risk, through the use of substituted pricing and manufactured defaults that were later incorporated into loss calculations and enforcement actions directed against Plaintiff.

87. Retention of those benefits is inequitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and:

A. Compensatory damages;

B. Treble damages and attorneys' fees under Va. Code § 18.2-500;

C. Disgorgement and restitution;

D. Pre- and post-judgment interest;

E. Injunctive and equitable relief;

F. Costs and such other relief as the Court deems just.

JURY TRIAL DEMANDED

Dated: February 2, 2026

Michael C. Hild,
Plaintiff, pro se
2302 E. Marshall Street
Richmond, VA 23223
(804) 306-4314
michaelchristopherhild@gmail.com

## CERTIFICATE OF SERVICE

I certify that on February 2, 2026, I caused the foregoing First Amended Complaint to be filed with the Clerk of the Court for the United States District Court for the Eastern District of Virginia. Upon filing, the Clerk transmitted a Notice of Electronic Filing through the Court's CM/ECF system, which served the document on all counsel of record and parties who have appeared in this action and are registered for electronic notice.

I further certify that on the same date, I served this document by email on all counsel who have appeared in this action, using the email addresses listed in their filings and/or used by such counsel in communications with me in this case.

Michael C. Hild

Plaintiff, pro se