# Exhibit A

# United States Court of Appeals
# For the Second Circuit

---

August Term 2024
Argued: December 20, 2024
Decided: July 30, 2025

No. 23-6136

---

UNITED STATES OF AMERICA

*Appellee,*

*v.*

MICHAEL HILD

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 1:19-cr-602-1, Ronnie Abrams, *Judge.*

---

Before:        Calabresi, Park, and Nathan, *Circuit Judge*s.

Defendant-Appellant Michael Hild appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Abrams, *J.*).  After a two-and-a-half-week trial, Hild was convicted by a jury of securities fraud, wire fraud, and bank fraud, as well as conspiracy.  The evidence at trial established that Hild and his co-conspirators at Live Well Financial, Inc., where he was Chief Executive Officer, engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of bonds used as collateral to secure cash loans.

On appeal, Hild asks us to reverse his conviction as based on legally insufficient evidence.  In the alternative, he argues that he is entitled to a new trial because *Ciminelli v. United States*, 598 U.S. 306 (2023), decided after his trial, invalidated one of the theories of fraud on which the jury was instructed.  We conclude that sufficient evidence supports Hild's conviction and that he is not otherwise entitled to a retrial.  Accordingly, we **AFFIRM** the judgment of the district court.[1]

––––––––

BRIAN A. JACOBS (Joshua P. Bussen, *on the brief*), Morvillo Abramowitz Grand Iason & Anello P.C., New York, NY, *for Defendant-Appellant.*

SCOTT HARTMAN (Hagan Scotten, *on the brief*), Assistant

---

[1] We address Hild's remaining claims in a summary order filed today.

United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

_____

NATHAN, *Circuit Judge*:

In 2021, a jury convicted Defendant-Appellant Michael Hild of securities fraud, wire fraud, bank fraud, and conspiracy. The evidence at trial established that Hild and his co-conspirators at Live Well Financial, Inc., where he was Chief Executive Officer, engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of bonds used as collateral to obtain cash loans. The scheme allowed Live Well to grow its bond portfolio exponentially, from approximately 15 bonds with a stated value of about $50 million in 2014 to approximately 50 bonds with a stated value of over $500 million by the end of 2016.

Hild now appeals his conviction, challenging the sufficiency of the evidence and arguing, in the alternative, that a new trial is warranted because the jury was erroneously instructed on a now-invalid theory of fraud. As to the sufficiency of the evidence, Hild contends that the Government's proof falls short of showing that he was responsible for any fraudulent statement or that he acted with fraudulent intent. We conclude that the Government's evidence was legally sufficient for a jury to find that Hild induced lenders into

loaning money to Live Well by misrepresenting the value of his collateral and that he did so with the intent to defraud.

As to the charging error, Hild argues that he is entitled to a new trial because the jury was instructed on a right-to-control theory of fraud, which was subsequently invalidated by the Supreme Court in *Ciminelli v. United States*, 598 U.S. 306 (2023). But although the jury instructions were indeed erroneous, no retrial is warranted because Hild was convicted on a theory of fraud that remains valid post-*Ciminelli*. Thus, we reject Hild's challenges and **AFFIRM** the judgment of the district court.

## BACKGROUND

### I.    Facts[2]

This case concerns a scheme by Live Well Financial, Inc. (Live Well) to secure cash loans by fraudulently inflating the value of the bonds used as collateral. Live Well was a private company that originated, serviced, and securitized government-guaranteed reverse mortgages known as Home Equity Conversion Mortgages.[3] Defendant-Appellant Michael Hild founded Live Well in 2005 and, at all relevant times, was its Chief Executive Officer and largest shareholder.

At the heart of Live Well's fraudulent scheme is a derivative of

---

[2] The factual background presented here is derived from the testimony and other evidence presented at trial, and we view the evidence in the light most favorable to the Government. *See United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015).

[3] Reverse mortgages are a special type of mortgage loan designed to provide liquidity to senior homeowners whose net worth is primarily tied up in their home equity. To securitize these loans means to pool the loans into bonds, called a mortgage-backed security, that can be sold to investors for profit. Pooling similar reverse mortgages into bonds allowed Live Well to sell the mortgages in bulk as opposed to one-by-one.

a particular kind of mortgage-backed security, known as a Home Equity Conversion Mortgage "interest only" bond. These bonds entitle the holder to receive a portion of the interest payments, but not the principal payments, from a pool of reverse mortgages. Since holders receive regular interest payments, the bonds are attractive to investors because they provide a steady stream of income.

### A. The Stifel Transaction

At Hild's direction, Live Well first purchased Home Equity Conversion Mortgage "interest only" bonds in 2014, acquiring a portfolio of roughly 15 bonds for about $55 million from a company called Stifel Financial. With the purchase of the portfolio, Hild also hired three Stifel employees (and eventual co-conspirators) to manage the portfolio. With Darren Stumberger at the helm, these employees were referred to as the "trading desk."

Live Well financed the acquisition and growth of its bond portfolio largely through loans. Many of its lenders were securities dealers whose lending arrangements were structured as bond repurchase agreements, also known as "repo agreements." A repo agreement is a collateralized loan in which title of the collateral is transferred to the lender. The borrower (Live Well) sells an asset (the bonds) to the lender with a promise to buy it back, typically after 30 days, at a price with interest. At the end of the period, lenders generally "roll" the loan forward, but they could alternatively end the agreement and demand repayment. In the event of a default, the repo lender is entitled to keep and sell the collateral to satisfy the borrower's debt.

Typically, the loan amount was determined by discounting the

value of the underlying bond by 10% to 30%. This "haircut" ensured that the lenders remained sufficiently collateralized if the value of the bonds decreased, and it priced in the risk of a lender having to sell the bonds. As the prices of the collateral fluctuated, either party could request that the loan amount be adjusted. If the value decreased, lenders could require partial repayment of the loan amount via a "margin call," and if the value increased, Live Well could request to borrow more via a "reverse margin call."

Since lenders generally lacked the expertise to value the bonds themselves, their loan agreements with Live Well required that the prices be set by an independent third party.[4] This is where Interactive Data Corporation (IDC) came in. For example, Live Well's contract with one of its lenders, Mirae Asset Securities Inc., required that the amount of the loan be adjusted based on "the aggregate Market Value of all Purchased Securities." Gov't Exhibit (GX) 603, at 3. "Market Value," in turn, was defined as:

> the price for such Securities on [a given] date obtained from (i) Interactive Data Corporation ("IDC") or (ii) if no quotation is available from IDC, then a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein . . . .

*Id*. at 11.

At the time of the Stifel transaction, IDC lacked the capability to value the bonds and so relied on "broker quotes" to provide

---

[4] There was one exception to this rule, since one of Live Well's lenders, Nomura, had a trading desk that determined the bond prices based on the market.

pricing. Live Well itself provided broker quotes, which were estimates as to what the bonds could be sold for in the market. In other words, IDC published prices provided by Live Well, which were in turn used in repo agreements to calculate the size of the loans Live Well could secure from most of its lenders.

This arrangement was meant to be temporary, and, by January 2015, IDC had developed its own pricing model to value the bonds. But Live Well was displeased with that model. Among other issues, it caused a daily decline in the bond prices, leading to margin calls from the lenders. Having to constantly repay the loans caused financial strain for the company, so Hild directed the trading desk to "rectify this problem." App'x at 74. By early 2015, Live Well and IDC agreed that they would return to the old "broker quote" system, in which Live Well supplied prices, and IDC published those prices "verbatim." *Id.* at 75.

### B. Shift to Scenario 14 Pricing

Later that year, Live Well began to develop its own internal models to project the value of the bonds. One such model was Scenario 14. Because Scenario 14 was based on assumptions that deviated from factors "in the market," its prices were typically higher than those for which the bonds could be sold. App'x at 81. Hild and other Live Well employees believed that the market underpriced the bonds because it failed to capture their "intrinsic" value. *Id.* at 130. And so, Scenario 14 was conceived as an "academic exercise," which reflected that sentiment. *Id.* at 303.

But it soon became much more than that. In September of 2015, on the heels of a steep decline in the bond prices, Hild instructed that

Scenario 14 prices be submitted to IDC. Under the Scenario 14 methodology, the value of the bonds soared, with Live Well's portfolio appreciating by about 20 percent or $11 million. But since such a substantial increase in a single day would set off "alarm bells," in Hild's own words, he directed his employees to phase in the methodology gradually using a "glide path." *Id.* at 121.

Because most of Live Well's repo agreements relied on IDC, Scenario 14 pricing allowed the company to enter into loan agreements where the loan amount would exceed the purchase price of the bond, producing an immediate windfall for Live Well. Eric Rohr, who was Live Well's Chief Financial Officer (CFO) until 2019, broke down the process as follows: Live Well would identify a particular bond it wished to buy, model the bond using Scenario 14, submit the Scenario 14 valuation to IDC, and then approach the lenders, who would look up the price on IDC's database and use that price to set the terms of the repo agreement. In a simultaneous transaction, Live Well would then go out and buy the bond at a lower price than the Scenario 14 valuation, deliver the bond to the lenders, and receive a cash loan. Whatever was left over after the purchase price was paid off would then be swept into Live Well's operating accounts. By the end of 2015, this process had resulted in an increase in the value of the company's portfolio of over $47 million.

### C. Liquidity Crisis and Unraveling

In January 2017, one lender, Wedbush, asked to speak with a Live Well dealer for more information about how the bonds were being valued. In a recorded call, Hild and his co-conspirators discussed how to address the request, which raised concerns because

having a broker price the bond could result in the lenders discovering that IDC was publishing Scenario 14 prices. The options discussed ranged from finding a "slimy" dealer willing to represent that IDC's prices were correct to attempting to convince Wedbush of Live Well's methodology. App'x at 96. Wedbush also sought to reduce Live Well's credit line and to stop lending against certain bonds, which triggered a liquidity crisis at Live Well, since selling the bonds was not enough for the company to pay down its debt. According to Rohr, defaulting on its debt to Wedbush would create cross-defaults with other lenders, likely leading Live Well to insolvency.

Faced with this liquidity crisis, Hild ordered the trading desk to hike up the bond prices above Scenario 14 values. No market rationale was supplied for this increase. With the new "Scenario 4" methodology, the trading desk gradually—to avoid raising "red flags"—marked up the portfolio by over $36 million. App'x at 348. Some six months later, however, Live Well reversed the Scenario 4 price increases, returning its quotes to about Scenario 14 values.

It was at this point that Live Well's scheme began to unravel. That same year, Live Well received a subpoena from the Securities and Exchange Commission (SEC), which led to a two-year investigation. And, over time, more lenders grew wary about how the bonds were valued. In 2018, for example, an investment bank informed the Industrial and Commercial Bank of China that the bonds had been priced at 50 percent above market value. As lenders discovered these discrepancies, they attempted to scale back the size of their loans, but Live Well did not have the money to cover its obligations.

By 2019, amidst one lender's efforts to call in its debt, Glen Haddock, who had replaced Rohr as CFO, began to suspect that Live Well's valuations were inflated. In investigating the matter, Haddock learned for the first time that Live Well had been supplying prices to IDC and that it had been modeling the bonds based on assumptions that he believed were unrealistic. Convinced that Live Well was overstating the value of its bond portfolio, Haddock ultimately refused to sign the company's financial statements, effectively forcing Live Well to shutter.

## II.    Procedural History

Not long after Live Well ceased operations, Hild was charged in a five-count indictment with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349; securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5; wire fraud, in violation of 18 U.S.C. § 1343; and bank fraud, in violation of 18 U.S.C. § 1344.

Hild maintained his innocence and proceeded to trial. After two and a half weeks of trial, the jury found him guilty on all counts. Hild then moved for a judgment of acquittal challenging the sufficiency of the evidence and, in the alternative, for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33. The district court denied both motions and sentenced Hild to 44 months' imprisonment. Hild timely appealed.

While his appeal was pending, Hild filed a second Rule 33 motion, alleging, as relevant, that the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which he asserted

renders his jury instructions invalid, requires a new trial.  The district court declined to reach the issue, deferring decision to our Court in his pending appeal.  Hild subsequently amended his notice of appeal to include the *Ciminelli* challenge.

## DISCUSSION

On appeal, Hild asks us to reverse his conviction for lack of sufficient evidence.  In the alternative, he asserts that he is entitled to a new trial based on charging error.  We conclude that sufficient evidence supports Hild's conviction and that he is not otherwise entitled to a retrial.

### I.  Sufficiency of the Evidence

Hild first argues that the evidence adduced at trial was insufficient as a matter of law to support his conviction.  He contends that the Government failed to prove (1) that he misrepresented the value of the bonds, or (2) that he had fraudulent intent.  We disagree.

We review preserved sufficiency-of-the-evidence challenges *de novo*, but "defendants face a heavy burden, as the standard of review is exceedingly deferential."  *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018) (quotation marks omitted).  A jury's verdict must be upheld "if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021) (cleaned up).  In a conspiracy case, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a

conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021) (quotation marks omitted).

Each count of Hild's indictment required that the jury find that (1) Hild had engaged in an act to defraud (or had conspired to do so), and (2) that he had done so with the intent to perpetrate a fraud. As to the act to defraud, a § 78j(b) securities fraud conviction requires a "material misrepresentation (or a material omission if the defendant had a duty to speak)" or the use of a "fraudulent device" "in connection with the purchase or sale of a security." *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019) (quotation marks omitted). And to sustain a conviction for bank fraud, the Government must prove a "scheme or artifice" to (1) defraud a financial institution, or (2) obtain money or property under the "custody or control" of a financial institution "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344; *see also United States v. Bouchard*, 828 F.3d 116, 124, 126 (2d Cir. 2016). The wire fraud statute is similar, also requiring the jury find a "scheme or artifice" with "money or property as an object" of the scheme. *Kousisis v. United States*, 145 S. Ct. 1382, 1390 (2025) (quotation marks omitted) (quoting 18 U.S.C. § 1343; and then *Ciminelli*, 598 U.S. at 312). All three statutes require that the defendant's conduct be intentional. *See, e.g.*, *United States v. Litvak*, 808 F.3d 160, 178 (2d Cir. 2015) (affirming that scienter for a § 78j(b) securities fraud conviction "embrac[es] intent to deceive, manipulate or defraud" (quotation marks omitted)); *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) ("[B]oth wire fraud and bank fraud require the Government to prove that the

defendant had an intent to deprive the victim of money or property.").

Hild challenges the sufficiency of the evidence on both of these fronts. On his theory, the proof at trial established that Scenario 14 pricing represented a "good-faith effort to determine accurate values for the bonds in the context of a highly illiquid market." Appellant Br. at 25. Live Well was not required to submit prices at which the bonds could be *immediately* bought and sold in the market, and there was no proof that market participants would not have paid Scenario 14 prices if Live Well's methodology had been disclosed. On the contrary, Hild and his co-conspirators believed that market participants *would* have paid Scenario 14 prices and only kept the methodology under wraps to preserve Live Well's business advantage. Thus, Hild asserts, the Government did not prove that he caused any fraudulent statement to be made or that he acted with fraudulent intent.

None of Hild's arguments are persuasive. As to the fraud itself, a rational juror could certainly find that the Government proved beyond a reasonable doubt that Hild obtained loans based on the false or deceptive claim that IDC's prices reflected market prices. *See Gramins*, 939 F.3d at 444 (requiring, *inter alia*, a "material misrepresentation (or a material omission if the defendant had a duty to speak)" "in connection with the purchase or sale of a security" for a § 78j(b) securities fraud conviction); *Calderon*, 944 F.3d at 85 ("[T]o sustain a conviction under [the wire and bank fraud statutes], the Government must prove that the defendant in question engaged in a deceptive course of conduct by making material misrepresentations."

(emphasis omitted)). Indeed, plenty of evidence was presented at trial that Hild deceived Live Well's lenders by (1) negotiating loan agreements based on the understanding that IDC would provide the market price of the bonds—that is, the prices at which the bonds *could be immediately bought and sold*—while (2) feeding prices to IDC that were well above the market price.

To begin, the jury had an ample basis to conclude that Hild agreed to borrow from the lenders based on market prices as quoted by IDC. Live Well's borrowing agreements with the lenders pegged the loan amount to the "market value" of the securities, defined as the price for such securities obtained from IDC or, alternatively, "a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source." App'x at 203, 228. Rohr explained that a bid is "what someone is willing to pay for an asset . . . to complete its sales transaction," *i.e.*, a market price. *Id.* at 293. Because the contracts packaged these options as a "market value" and provided "most recent closing bid quotation" as an alternative, the jury could infer that Live Well billed the loan agreements as based on market prices.

Consistent with this evidence, trial testimony generally showed that market prices were the whole ballgame for repo agreements, dictating how much cash was lent, who could make margin calls, whether Live Well could cover its debt, and how much lenders could recoup if Live Well defaulted. As one lender explained:

> From a repo perspective, we're not an investor looking at intrinsic value and not thinking of that over the life of this investment we're going to get back X return, I'm

more interested in the liquidity, where can I sell it on the market.  What does the market pay for this bond today?

App'x at 204.

Indeed, both Stumberger and Rohr further testified that lenders relied on IDC to provide bond valuations intended to approximate market rates.  So too did the lenders.  Based on this evidence, the jury could find that the lenders agreed to extend credit to Live Well with the expectation that IDC would provide the market price of its collateral.

In resisting this conclusion, Hild points to language in IDC's subscription agreement cautioning that quoted prices "may not conform to actual purchase or sale prices in the marketplace." Appellant Br. at 29.  But, as the district court observed, in context, the agreement makes clear that IDC's rates represent an attempt to capture "'what the holder [of a security] would receive in an orderly transaction . . . under current market conditions,'" that is, a market price.  App'x at 646.  And even if this language could be read to suggest that Hild never falsely stated that IDC prices were market prices, there was sufficient evidence for the jury to conclude that, based on Hild's omissions and misstatements, lenders reasonably expected that IDC's rates were tied to the market.  *See United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (explaining that a scheme to defraud "is characterized by a departure from community standards of fair play and candid dealings" (quotation marks omitted)); *see also United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) ("The scheme exists although no misrepresentation of fact is made." (quotation marks omitted)).

In addition, the Government's proof also permitted a reasonable jury to find that the Scenario 14 and later the Scenario 4 prices that Hild caused Live Well to submit to IDC differed substantially from market prices. For one, Live Well kept records demonstrating the differences between market prices and Scenario 14 prices. And, according to an SEC chart shown at trial, with the onset of Scenario 14, there were bigger (upward) gaps between the prices at which Live Well bought bonds and their subsequent IDC valuation. The jury also heard multiple recorded phone calls in which Hild and his co-conspirators discussed the disparity. As the district court observed, that Live Well routinely purchased bonds at one price, and immediately generated cash via the loans that were based on much higher IDC prices further supports this conclusion. Plus, Stumberger and Rohr both testified that Live Well's internal valuation was well above market value. As to Scenario 4, the jury heard testimony that Hild implemented arbitrary price increases beyond Scenario 14, which were, as established, already above market, to survive the 2017 liquidity crisis.

Against this backdrop, whether Live Well could have sold the bonds at Scenario 14 prices had its methodology been disclosed is immaterial. Even assuming market participants would have bought into the Scenario 14 methodology, the fact of the matter is that it was not disclosed. Thus, the market was not transacting at Scenario 14 prices. And yet, the jury learned that Hild secured loans based on lenders' belief that IDC prices were market prices, when they were actually marked-up Scenario 14 prices. In sum, sufficient evidence was presented for a reasonable jury to find that Hild induced Live

Well's lenders to extend credit by deceiving them as to the value of his collateral.

As to the intent to defraud, Hild's arguments fare no better. "[D]irect proof of defendant's fraudulent intent is not necessary"; rather, "[i]ntent may be proven through circumstantial evidence." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). And "[w]here the false representations are directed to the quality, adequacy or *price* of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain." *United States v. Binday*, 804 F.3d 558, 578 (2d Cir. 2015) (emphasis added) (quotation marks omitted), *abrogated on other grounds by, Ciminelli*, 598 U.S. at 313-16. Here, the jury was presented with more than enough evidence to find that Hild knowingly caused Live Well to submit above-market bond prices to IDC, fully aware that the lenders understood those prices (and thus the terms of their loans) to reflect market values, and that he did so to increase Live Well's liquidity.

At trial, Stumberger and Rohr testified that Hild directed them to increase the prices submitted to IDC to boost the company's ability to borrow from lenders. And even beyond the evidence of the scheme, which may itself speak to a defendant's fraudulent intent, *see Guadagna,* 183 F.3d at 130, there was plenty of circumstantial evidence of Hild's state of mind. In one recorded call, Hild himself described Scenario 14 as a "self-generating money machine." App'x at 305 (quotation marks omitted). And in the call regarding Wedbush's request for a third-party quote, Stumberger remarked that the lender did not care about Live Well's estimation of the bonds' purportedly

"intrinsic" value, but rather "about the market," to which Hild responded "[t]here's no debating that." *Id.* at 96-97. On that call, he and his co-conspirators also discussed how to best avoid detection, including the possibility of recruiting a "slimy" broker to help prevent Wedbush from learning of the discrepancy between their valuations of the bonds and their market price. *Id.* at 96. As the district court concluded, it is reasonable to infer from these statements that Hild knew that supplying above-market Scenario 14 prices to IDC "was at best misleading, and that he understood the need to prevent the lenders from learning of the fraud." *United States v. Hild*, 644 F. Supp. 3d 7, 30 (S.D.N.Y. 2022); *see also Binday*, 804 F.3d at 578 (explaining that fraudulent intent may be proven "by showing that [the] defendant made misrepresentations to the victim(s) with knowledge that the statements were false" (quotation marks omitted)).

In addition to these statements, on various occasions, Hild directed Live Well employees to take steps to prevent discovery of the scheme. To avoid setting off "alarm bells" when adopting the Scenario 14 prices, Hild instructed that the trading desk implement those prices incrementally, on a "glide path." App'x at 83. The same conduct was repeated during the liquidity crisis in 2017. Hild also directed that Live Well buy whole tranches of bonds, so that no one in the market could see that the prices for Live Well's bonds did not match the prices from comparable bonds in a tranche. And when lenders began to ask questions about the value of Live Well's collateral, Hild disclaimed any knowledge of why IDC's valuations might be significantly higher than those of a different company that

had more recently begun pricing the bonds. He also transferred approximately $17 million from his own account to an account in the name of his wife's business. Together, Hild's statements, his efforts to conceal the Scenario 14 scheme, and his co-conspirators' testimony were sufficient for a reasonable jury to find that Hild acted with the "conscious knowing intent to defraud." *Guadagna*, 183 F.3d at 129 (quotation marks omitted).

Nothing in *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Hild principally relies, compels the opposite conclusion. In *Connolly*, bankers were charged with inducing their coworkers to make false or misleading statements in submitting hypothetical borrowing rates to the British Bankers Association. *See id.* at 824. The Association's guidelines stipulated that rate submissions should reflect "the rate at which [the bank] could borrow funds, were it to do so." *Id.* at 835 (emphasis omitted). The evidence did not show that the defendants' bank could not borrow at the interest rates stated in the defendants' submissions. *See id.* at 835-36. Rather, the Government argued that these submissions were false or misleading because they deviated from the rates produced by the bank's pricing model and considered the bank's own financial interests. *See id.* at 836. In reversing the bankers' convictions, we found that, "viewed as a whole," the trial evidence did not sufficiently support the Government's theory of fraud because there was no "one true interest rate" at which the bank could borrow funds. *Id.* at 837. We also held that there was no "trick, deceit, chicane or overreaching," *McNally v. United States*, 483 U.S. 350, 358 (1987) (quotation marks omitted), because the bank's submissions "did not implicitly represent that

there had been no consideration of [its] existing trades," *Connolly*, 24 F.4th at 842.

In Hild's view, that the Government in *Connolly* was required to prove falsity by showing that the bankers' submissions reflected rates at which their bank *could not have borrowed*, *see* 24 F.4th at 842-43, means that in this case it had to show that Live Well's submissions to IDC reflected prices at which the bonds *could not have been resold* if its methodology were disclosed. But as we have already explained, whether Live Well could have sold the bonds at Scenario 14 prices had its methodology been disclosed is immaterial. And while it is true here, as it was in *Connolly*, *see id.* at 843, that the mere unfairness of Hild's actions would not be sufficient to establish fraudulent conduct or intent, that is not what the Government's theory boils down to. Unlike in *Connolly*, the Government sufficiently established that there was at least an implicit understanding that Live Well's repo agreements were based on market prices, to be determined by IDC, and that, despite being aware of this fact, Hild caused quotes to be submitted that he knew could *not* be obtained in the market to keep Live Well flush with cash.

Plus, the Government did not rely exclusively on Live Well's submissions to IDC to establish that Hild engaged in a scheme to defraud. It also presented evidence that Hild secured the repo loans by misrepresenting the value of Live Well's assets in the company's financial statements. These statements listed Live Well's largest asset, the Home Equity Conversion Mortgage "interest only" bond portfolio, as valued at "exit price"—meaning the price for which a buyer and seller would transact. App'x at 326. And yet, Live Well

was using the inflated Scenario 14 prices to value the portfolio. The lenders relied on these financial statements in determining how much credit to extend to Live Well. Based on this evidence, a reasonable jury could further conclude that Hild made false or deceptive statements in Live Well's financial statements to obtain the loans.

Accordingly, we find that Hild's convictions were based on legally sufficient evidence.

## II.     *Yates* Error

In the alternative, Hild argues that he is entitled to a new trial because *Ciminelli v. United States*, 598 U.S. 306 (2023), which was decided after his trial, invalidated one of the theories of fraud on which the jury was instructed. Although we agree that, under *Ciminelli*, the district court erred in instructing the jury on a right-to-control theory of wire fraud, we conclude that Hild is not entitled to new trial because he was convicted on a theory of fraud that remains valid post-*Ciminelli*, and the court's error did not otherwise taint his convictions.

Under *Yates v. United States*, 354 U.S. 298 (1957), "a jury verdict constitutes legal error when a jury, having been instructed on two disjunctive theories of culpability, one valid and the other invalid, renders a guilty verdict in circumstances that make it impossible to tell which ground the jury selected." *United States v. Laurent*, 33 F.4th 63, 86 (2d Cir. 2022) (citing *Yates*, 354 U.S. 298). We review unpreserved *Yates* claims for plain error. *See id.* To meet this standard, Hild must show that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected [his] substantial rights; and (4) the error seriously

affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020).

As explained, the wire fraud statute requires a "scheme or artifice to defraud" with "money or property as an object of [the] fraud." *Kousisis*, 145 S. Ct. at 1390 (quotation marks omitted) (quoting 18 U.S.C. § 1343; and then *Ciminelli*, 598 U.S. at 312). The "money or property" requirement "limit[s] the 'scheme or artifice to defraud' element because the 'common understanding' of the words 'to defraud' when the statute was enacted referred 'to wronging one in his property rights.'" *Ciminelli*, 598 U.S. at 312 (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)). Prior to *Ciminelli*, we considered qualifying "property rights" to include "intangible interests," "such as the right to control the use of one's assets." *Calderon*, 955 F.3d at 88 (quotation marks omitted). Thus, a defendant could violate § 1343 "simply by scheming to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Kousisis*, 145 S. Ct. at 1398 (cleaned up) (quoting *Ciminelli*, 598 U.S. at 310). But *Ciminelli* rejected this "right-to-control" theory, reasoning that it "cannot be squared with the text of the federal fraud statutes," 598 U.S. at 314, which "criminalize only schemes to deprive people of traditional property interests," *id.* at 309.

In instructing the jury on wire fraud, the district court explained, without objection from Hild, that the Government must "prove that the alleged scheme contemplated depriving another of money or property," and that "a person is not deprived of money or property only when someone directly takes his money or property," but also *"when he is deprived of a right to control that money or property."*

App'x at 630 (emphasis added).  Since these instructions define "property" to include the "right to control" property in the manner *Ciminelli* now forbids, they constitute a "clear or obvious" error. *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010) (quotation marks omitted).  This conclusion applies with equal force to the wire fraud conspiracy count, which expressly incorporated by reference the erroneous jury instruction.  *See United States v. Jackson*, 180 F.3d 55, 72 (2d Cir. 1999) (setting aside a conspiracy conviction that incorporated the erroneous instruction on the substantive count), *overruled on other grounds on reh'g*, 196 F.3d 383 (2d Cir. 1999).[5]

However, this *Yates* error did not, as is required for us to vacate a conviction on plain error review, affect Hild's substantial rights.  To show an erroneous jury instruction affected his substantial rights, the defendant must show "a reasonable probability that the jury would not have convicted him absent the error."  *Marcus*, 628 F.3d at 42.  In the context of *Yates* errors, we have also described this test as requiring us "to determine whether the defendant was prejudiced by the error by asking whether the erroneous jury instruction was harmless beyond a reasonable doubt."  *United States v. Capers*, 20 F.4th 105, 123 (2d Cir. 2021) (quotation marks omitted); *see also United States v. Laurent*, 33 F.4th 63, 87 n. 10 (2d Cir. 2022) (explaining that there "does not appear to be an appreciable differen[ce] between these standards" (quotation marks omitted)).  Here, there is no reasonable probability that the jury would have acquitted Hild if they had not

---

[5] Hild argues that *Ciminelli* renders the instructions as to bank fraud and bank fraud conspiracy erroneous as well.  We need not decide that question, since even assuming that were the case, we conclude that the *Yates* error did not affect his substantial rights for the reasons explained below.

been instructed on a right-to-control theory of fraud.

Hild argues that the Government advanced two theories at trial: One was *a right-to-control theory of fraud*, which posited that Hild deceived lenders as to IDC's independence and so deprived them of the ability to make an informed economic decision about what to do with their money. And the other was a *traditional property theory of fraud*, which contended that Hild deceived lenders as to the value of the bonds to secure loans and so deprived them of their money. And because the jury rendered a general verdict, it is impossible to know on which theory he was convicted.

It is true that the Government elicited testimony that Live Well did not disclose, and that lenders did not know, that Live Well was puppeteering IDC's prices and would not have extended loans if they had. Hild is also right that the Government emphasized that he misled the lenders into believing that they were receiving third-party pricing for Live Well's collateral.

But the Government's primary theory at trial was, by a long shot, a traditional fraud theory: that Hild cheated lenders out of their money by overstating the market value of Live Well's collateral (by way of IDC) and, to a lesser extent, of its assets (through its financial statements). And, although the two theories are not quite "one and the same," Gov't Br. at 25, the evidence supporting any right-to-control theory "form[ed] part of a single narrative" in service of the traditional fraud theory, *United States v. Eldridge*, 2 F.4th 27, 39 (2d Cir. 2021), *vacated and remanded on other grounds*, 142 S. Ct. 2863 (2022).

The point of emphasizing that lenders expected IDC to be independent, for example, was often to show that lenders expected its

prices to reflect market values, since the owner of the collateral has an incentive to artificially inflate its value, and so that, in relying on IDC, the lenders were extending credit to Live Well based on what they believed were market prices. And showing that Live Well successfully kept lenders in the dark about its role in supplying prices to IDC for so long was part of establishing how Hild managed to trick them as to the value of his collateral *to get their money*. It was because the lenders did not know that Live Well was effectively pulling the strings at IDC that Hild managed to turn Scenario 14 (and later Scenario 4) into a "self-generating money machine." App'x at 305 (quotation marked omitted). In this sense, the two theories of liability, to the extent there were two theories, were inextricably intertwined. For this reason, there is no reasonable probability that the jury *solely* convicted Hild on a right-to-control theory. Or, put differently, it is beyond a reasonable doubt that the jury convicted Hild on a traditional theory of fraud.

The outcome of this case might be different if, for instance, the Government had argued to the jury that it need not prove that Hild inflated the value of his collateral to secure the loans because it could convict on a right-to-control theory alone. *Cf., e.g.*, *United States v. Skelos*, 707 F. App'x 733, 737-38 (2d Cir. 2017) (vacating convictions due to *Yates* error where, among other things, the Government expressly argued that the later-invalidated theory was sufficient to carry its burden on an element of the crime). Or if the evidence supporting each theory of liability was sufficiently distinct so as to raise reasonable doubts as to whether the jury would have convicted Hild absent the *Yates* error. But that is simply not the case.

Hild derives no support from the remaining cases on which he relies. In *United States v. Silver*, 864 F.3d 102, 124 (2d Cir. 2017), we found that the use of certain overbroad jury instructions, later invalidated by the Supreme Court, warranted vacatur of the defendant's convictions. But, unlike here, most of the acts proved by the Government in that case no longer clearly fell within the ambit of the statutory definition that had been clarified. *See id.* at 119-124. And in *United States v. Bruno*, 661 F.3d 733, 739-40 (2d Cir. 2011), we vacated several convictions based largely on the Government's concession, so that opinion contains little reasoning that bears on whether the erroneous instruction affected Hild's substantial rights. In any event, the district court in *Bruno* had instructed the jury solely on a theory of fraud that was subsequently rejected by the Supreme Court. *See id.* at 740, 742. Since Hild's jury was instructed on a still-valid theory of fraud, as well as the now-invalid right-to-control theory, *Bruno* sheds no light on his circumstances.

Further, to the extent Hild argues that his securities fraud convictions should be vacated due to "spillover prejudice" from the erroneous jury instructions, that argument is meritless. "Prejudicial spillover occurs where 'the jury, in considering one particular count or defendant, was affected by evidence that was relevant *only* to a different count or defendant.'" *United States v. Sullivan*, 118 F.4th 170, 211 (2d Cir. 2024) (emphasis added). Since the alleged right-to-control evidence explains how Hild mispresented the value of the bonds, that evidence was relevant with respect to the securities fraud counts.

Therefore, we find that neither the *Yates* error nor any purported prejudicial spillover entitles Hild to a new trial.

## CONCLUSION

The judgment of the United States District Court for the Southern District of New York is **AFFIRMED**.