# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

UNITED STATES,

v.

MICHAEL HILD,

                    Defendant.

No. 19-CR-602 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

In April 2021, a jury convicted Michael Hild on five counts of fraud in connection with his participation in a multi-year scheme to inflate bond values to secure large loans for his employer. The Court ordered Hild to pay restitution but deferred its determination of the amount pending further analysis and the potential resolution of disputes over the loss amount. On February 20, 2024, Magistrate Judge Parker issued a report and recommendation in which she recommended that the Court order Hild to pay $46,455,594.00 in restitution. For the reasons that follow, the Court adopts that recommendation in large part, ordering Hild to pay $45,715,100.72 in restitution.

## BACKGROUND[1]

Following a two-week trial in 2021, a jury convicted Michael Hild of committing securities fraud, wire fraud, and bank fraud, as well as conspiring to do so. His conviction stemmed from his role in a multi-year scheme to inflate the value of "interest only" bonds that secured a windfall for Live Well Financial, where Hild was the chief executive officer and largest shareholder. Through that scheme, Live Well purchased bonds at one price and then used them, at their inflated value,

---

[1] The Court assumes the reader's familiarity with the underlying facts and procedural history of this action, about which the Court has written extensively. *See United States v. Hild*, 644 F. Supp. 3d 7, 18 (S.D.N.Y. 2022); *United States v. Hild*, No. 19-CR-602, 2023 WL 5928350, at *1 (S.D.N.Y. Sept. 12, 2023); *United States v. Hild*, No. 19-CR-602, 2023 WL 8622194, at *1–2 (S.D.N.Y. Dec. 13, 2023); Opinion & Order at 2–6, *United States v. Hild*, No. 19-CR-602 (S.D.N.Y. July 10, 2024).

as collateral to obtain loans worth significantly more than the price for which it could sell the bonds.

After several years, the scheme began to unravel. The loan agreements allowed the lenders to add the bonds to their books if Live Well defaulted on its loan payments. The lenders could then keep or sell the bonds to repay the defaulted loans. Accordingly, when Live Well defaulted on its loan payments in 2018 and 2019, the lenders took possession of the bonds on their books. Those four lenders—(1) Industrial and Commercial Bank of China ("ICBC"), (2) Customers Bank, (3) Mirae Asset Securities (USA), Inc., and (4) Flagstar Bank—then began the process of selling the bonds.

The process was not entirely straightforward for each lender. ICBC's head of legal, for example, testified that it would have been a "stretch" to say there was a market for the bonds. Evidentiary Hearing Transcript ("Tr.") at 193, Dkt. 223. Nonetheless, each lender solicited bids and ultimately sold their bonds. *See id.* at 16, 102, 140, 193. ICBC solicited bids, compared the bids to pricing figures supplied by Bloomberg and others, and subsequently sold the bonds, including to the Bank of Montreal, where it was the highest bidder. *See id.* at 193; Letter and Supporting Documentation, Dkt. 187-3. Customers Bank, meanwhile, sold the bonds pursuant to 11 U.S.C. § 559, *see* Tr. at 139, which allows certain parties to liquidate collateral in spite of an automatic bankruptcy stay, *see In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 811 (3d Cir. 2019). To do so, it "engaged Raymond James to market the [bonds] and . . . try to get [it] the best price that [it] could." Tr. at 139. After considering the offer from the highest bidder, it decided to pay one cent more to buy the bonds itself. *See id*. at 139–40. The following year, it resold the bonds to a third party. *See id.* at 143. Mirae and Flagstar also sold their bonds, recouping some of their loans. *See id.* 91–93, 102. While the lenders held the bonds, they also received interest payments

on those bonds, known as "coupon payments," which helped to recoup some of their loans. Additionally, some lenders subsequently received related civil settlement money.

Years later, on January 27, 2023, the Court sentenced Hild to 44 months' imprisonment and ordered him to pay restitution to the victims of his offenses. As to the amount of restitution, the Court deferred its decision, affording the parties time to determine compensable expenses and resolve disputes over the loss amount. A flurry of letters, including additional briefing ordered by the Court, followed. The Court held oral argument on August 9, 2023 and, in accordance with the parties' preference, subsequently referred the matter to Judge Parker for a report and recommendation on the restitution calculation.

Before issuing a report, Judge Parker twice ordered additional briefing. The Government and the four lenders filed numerous updated submissions. So did Hild. Another victim—the Bankruptcy Estate of Live Well Financial, Inc.—also provided documentation supporting its claimed losses for legal fees and related expenses. In sum, the victims "contributed hundreds of pages of admissible evidence in the form of billing records, trade confirmations, and sworn declarations." Report and Recommendation ("Report") at 12, Dkt. 228. The lenders' submissions also included charts that Judge Parker requested to help aid her analysis. *See* Oct. 11, 2023 Order, Dkt. 198; Conference Transcript at 20–21, 28–31, Dkt. 196. In addition, on January 12, 2024, Judge Parker conducted an evidentiary hearing lasting approximately four hours, during which the Government, Hild, and Judge Parker each questioned the witnesses for the victims. After the hearing, Judge Parker provided the parties yet another opportunity to file letters indicating their positions. *See* Order, Dkt. 222. As the parties updated and supplemented their filings, some of the victims' calculations changed and some admitted to past calculation errors. *See, e.g.*, Tr. at 125, 170. Ultimately, the Government sought a total restitution award of $46,534,236.90.

In her February 20, 2024 Report, Judge Parker recommended that the Court order Hild to pay $46,455,594.00 in restitution. Specifically, she recommended the following amounts be awarded according to calculations below:

| ICBC | |
|---|---|
| Loan Balance | $138,299,412.30 |
| Carrying Costs | $4,316,776.08 |
| Sale Proceeds Received | ($68,373,241.75) |
| Coupons Received | ($39,947,882.22)[2] |
| Settlement Money Received | ($16,500,000.00) |
| **Total Restitution Recommended** | **$17,795,124.41** |

| Customers Bank | |
|---|---|
| Loan Balance | $24,814,287.00 |
| Prepetition Interest Costs | $218,633.09 |
| Carrying Costs | $36,601.07 |
| Legal Fees | $57,180.80 |
| Sale Proceeds Received | ($17,156,665.34) |
| Coupons Received | ($325,244.58) |
| **Total Restitution Recommended** | **$7,644,792.04** |

---

[2] As evidenced by the Government's post-hearing filing, this figure contains a typographical error and should instead state $39,947,822.22. *See* Letter at 4, Dkt. 225. The input of this number, rather than the one stated in the Report, results in the total identified by Judge Parker.

| Mirae | |
|---|---|
| Loan Balance | $104,201,134.00 |
| Prepetition Interest Costs | $615,000.00 |
| Carrying Costs | $5,853,569.34.00 |
| Legal Fees | $23,310.00 |
| Sale Proceeds Received | ($46,182,902.52)[3] |
| Coupons Received | ($45,182,624.55) |
| Settlement Money Received | ($11,197,016.00) |
| **Total Restitution Recommended** | **$7,397,470.27** |

| Flagstar | |
|---|---|
| Loan Balance | $66,298,850.00 |
| Sale Proceeds Received | ($35,752,801.00) |
| Coupons Received | ($709,816.00) |
| Settlement Money Received | ($16,471,876.00) |
| **Total Restitution Recommended** | **$13,364,357.00** |

| Estate | |
|---|---|
| Professional Fees | $232,328.00 |
| Reimbursable Expenses | $21,522.53[4] |
| **Total Restitution Recommended** | **$253,850.25** |

On March 5, 2024, Hild timely filed objections to Judge Parker's Report. Upon review of Hild's objections, the Court ordered the Government, on behalf of Mirae and the Estate, to submit revised billing records of purportedly compensable expenses.

## LEGAL STANDARD

In reviewing a magistrate judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where a party timely objects to any portion of a magistrate

---

[3] As evidenced by the Government's post-hearing filing, this figure contains a typographical error and should instead state $46,915,902.52. *See* Letter at 1. The input of this number, rather than the one stated in the Report, results in the total identified by Judge Parker.

[4] As evidenced by the Government's post-hearing filing, this figure contains a typographical error and should instead state $21,522.25. *See* Letter at 5. The input of this number, rather than the one stated in the Report, results in the total identified by Judge Parker.

judge's report and recommendation, the district court reviews those portions of the report *de novo*. *See United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). Otherwise, the court may adopt the report and recommendation absent clear error. *See Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018); 28 U.S.C. § 636. Moreover, where "objections are nonspecific or merely perfunctory responses . . . argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition," the clear error standard also applies. *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022); *see also id*. n.4.[5] Although Hild presents nearly all of the same arguments that he did before Judge Parker, his objections are neither "nonspecific" nor "perfunctory." *Id*. at 120. Accordingly, the Court reviews the portions of the Report he objects to *de novo* and otherwise for clear error.

## DISCUSSION

Hild's numerous objections to Judge Parker's Report generally fall into two categories. First, he takes issue with how she factored the lenders' sales of the bonds into her restitution calculation. Second, he challenges the evidentiary support underlying her recommendations. The Court addresses each set of arguments in turn. The Court finds his objections meritless, except those about the evidence supporting Mirae's and the Estate's legal fees, as well as Mirae's pre-petition interest claim—which together require a $740,493.28 reduction in Hild's restitution obligation. The Court otherwise finds no clear error in Judge Parker's Report.

---

[5] Unless otherwise indicated, this opinion and order omits all internal quotations marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

## I.    Objections Regarding Bond Sales

### A.  Self Imposed Losses

Hild first contends that Judge Parker "ignored" that the lenders themselves caused their claimed losses by selling the bonds. Objections at 1, Dkt. 229. In particular, he maintains that the lenders' decision to sell the bonds rather than keep them and continue collecting interest payments was the direct and proximate cause of their losses. Judge Parker rejected this very argument in a prior order, *see* Order at 16–17, Dkt. 209, as does this Court.

The Mandatory Victims Restitution Act ("MVRA") requires defendants convicted of fraud offenses to make restitution to victims, *see* 18 U.S.C. § 3663A(a)(1), (c)(1)(ii), defined principally as "person[s] directly and proximately harmed as a result of the commission of [the] offense[s]," 18 U.S.C. § 3663A(a)(2).[6] As a corollary requirement, the defendant need only make restitution "in the amount of losses directly and proximately caused by the [their] conduct." *United States v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir. 2013). "[T]he MVRA," moreover, "requires only a reasonable approximation of losses supported by a sound methodology." *Id.* at 196; *see United States v. Rainford*, 110 F.4th 455, 490 (2d Cir. 2024).

To make restitution under the MVRA, the defendant must return to the victim the property lost as a direct and proximate result of the offense. 18 U.S.C. § 3663A(b)(1)(A); *Gushlak*, 728 F.3d at 194–95. Where, as here, returning the lost property is "impossible, impracticable, or inadequate," the defendant must pay the victim "an amount equal to . . . the value of the property" reduced by "the value . . . of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B).

---

[6] "[I]n the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a "victim" is "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Although Hild was convicted of both conspiracy and substantive offenses, the distinction between the two different definitions of "victim" is not relevant here.

Where the property lost was money, the property returned must also be money. *See Robers v. United States*, 572 U.S. 639, 643 (2014).

Hild's argument that the lenders caused their own losses misconstrues the basic principles relevant to calculating a defendant's restitution obligation. Here, the lenders' principal lost property is the money they loaned to Live Well based on Hild's fraud. *See id.* at 642–43; *see also United States v. Holmes*, 673 F. Supp. 3d 1049, 1058 (N.D. Cal. 2023) ("An investor victim's loss is the full amount of the property given (*i.e.*, money) at the time of the fraudulently induced investments, irrespective of any shares the victims received or the value of those shares."). The sale of the bonds reduces the amount of restitution Hild owes because the proceeds constitute returned property. *See* 18 U.S.C. § 3663A(b)(1)(B); *Robers*, 572 U.S. at 643. But the sale itself did not cause the lenders' losses. Hild's conduct did.

Hild's argument also misinterprets the MVRA's "direct[] and proximate[]" causation requirement. 18 U.S.C. § 3663A(b)(1)(A); *see Gushlak*, 728 F.3d at 194–95. Generally, where fraud causes an entity to loan money, that fraud is a "direct[] and proximate[]," 18 U.S.C. § 3663A(b)(1)(A); *see Gushlak* 728 F.3d at 194–95, cause of the loss of that money, *see Robers*, 572 U.S. at 645–46. In some circumstances, a victim may take action that "break[s] the causal chain," impacting the loss calculation. *Id.* at 646. Such actions may not be foreseeable to the defendant. *See id.* at 645–46; *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021). They are also ones that, without a calculation adjustment, might allow victims to obtain a windfall, overstepping the MVRA's goal of making victims whole. *See United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006). A victim could break the causal chain, for example, by donating collateral or "s[elling] it to a friend for a nominal sum," *Robers*, 572 U.S. at 646. Calculating a restitution obligation using a donation or nominal sale price could result in overcompensation. *See Boccagna*, 450 F.3d at 117.

For instance, inputting a nominal sale price would "award[] the victim *both* [(1)] restitution in the full amount of loss offset only by the nominal sale price *and* [(2)] the benefit of the . . . ab[ility] to make a gift to a putative purchaser in an amount equal to the difference between the property's fair market value and the nominal sale price." *Id*.

Here, however, the Court finds no reason to depart from the general rule that where fraud causes an entity to loan money, that fraud is a "direct[] and proximate[]," 18 U.S.C. § 3663A(b)(1)(A); *see Gushlak*, 728 F.3d at 194–95, cause of the loss of that money, *see Robers*, 572 U.S. at 645–46. The record lacks evidence that the lenders took action that would "break the causal chain." *Id.* at 646. First, the sale of the bonds was foreseeable. *Cf. United States v. Luis*, 765 F.3d 1061, 1068 (9th Cir. 2014) (observing that the sale of defaulted loans was foreseeable); *United States v. Cean*, 771 F. App'x 81, 83 (2d Cir. 2019) (observing "the common industry practice of selling loans on the secondary market"). As was the case here, "[m]any victims who lose money but subsequently receive other property," such as "collateral securing a loan," "will sell that other property and receive money from the sale." *Robers*, 572 U.S. at 644. Indeed, the loan transactions were structured such that if Live Well defaulted on its loan payments, the lenders could sell the bonds to repay the loans. *See United States v. Hild*, 644 F. Supp. 3d 7, 19 (S.D.N.Y. 2022). Second, the Court finds no basis for the contention that reducing Hild's restitution obligation by the sale proceeds would result in a windfall for the lenders. They neither donated the bonds nor sold them for a nominal price. *See Robers*, 572 U.S. at 646. Rather, they each sold the bonds with an eye toward the greatest return. *See* Tr. at 15, 102, 127, 140, 193.

Simply put, Judge Parker did not "ignore" that the victims themselves caused their losses because Hild directly and proximately caused those losses.

### B. Proceeds from Bond Sales

Hild next argues that, even accepting that he caused the losses, Judge Parker miscalculated the amount by which his restitution obligation to ICBC and Customers Bank should be offset by the sale proceeds. Accordingly, he asserts that any restitution obligation to ICBC and Customers should be lower than recommended. The Court disagrees.

#### 1. ICBC's Bond Sales

Hild maintains that he owes less restitution to ICBC than recommended by Judge Parker because ICBC failed to demonstrate that it sold the bonds for a "fair price" and without "any collateral benefits." Objections at 9. This argument rests on Hild's assumption that ICBC sold the bonds to a related-party, Bank of Montreal. Even if his assumption is true, Hild's argument fails.

"As a general matter, the burden of proof as to a given issue is normally placed on the party that has an affirmative goal and presumptive access to proof." *United States v. Smathers*, 879 F.3d 453, 460 (2d Cir. 2018). While the Government bears the "burden of demonstrating the amount of the loss sustained by a victim as a result of [an] offense," 18 U.S.C. § 3664(e), defendants bear the burden "[w]ith respect to requests . . . for credits against their restitution obligations." *Smathers*, 879 F.3d at 460. Such credits can include payments made by a defendant himself or by others. *See id.*; *United States v. Elson*, 577 F.3d 713, 735 (6th Cir. 2009), *abrogated on other grounds by Lagos v. United States*, 584 U.S. 577 (2018).

Here, Hild "unquestionably has the strongest incentive to establish that he is entitled to a reduction of his . . . restitution obligation" stemming from the sale of the bonds. *Smathers*, 879 F.3d at 461. In addition, "as the government was not a party to" the sale of the bonds, it "has no greater access" than Hild to information on the relationship between ICBC and Bank of Montreal. *Id*. Accordingly, Hild bears the burden of demonstrating that he should receive a larger credit for

ICBC's bond sales. Yet Hild offers no evidence that ICBC sold the bonds for other than a "fair price" or that it received any collateral benefits at all. The phrasing of his objection reveals as much: Hild argues only that Judge Parker ignored evidence that the sale "*could* have provided ICBC with undisclosed benefits that would offset" its claimed losses. Objections at 9 (emphasis added).

In any event, the Government proffered persuasive evidence that $68,373,241.75—the amount that ICBC sold the bonds for—is indeed the proper offset value for the bond sale proceeds. "[F]air market value will generally provide the best measure to ensure restitution in the full amount of the victim's loss." *Boccagna*, 450 F.3d at 109. A letter and accompanying documentation from ICBC's head of legal indicates that ICBC sold its bonds by soliciting bids and selling them to the highest bidder, which was not always Bank of Montreal. *See* Letter and Supporting Documentation, Dkt. 187-3; *see also* Tr. at 193. In doing so, ICBC took into account prices provided by pricing services such as Bloomberg. *See* Letter and Supporting Documentation, Dkt. 187-3; *see also* Tr. at 193. The sale prices did not drastically differ from those provided by the pricing services. *See* Letter and Supporting Documentation at 2.[7] This evidence provides a strong argument that ICBC sold the bonds for fair market value.

To be sure, the record contains some evidence suggesting that, due to an underdeveloped market, $68,373,241.75 may not equal the "fair market value" of the bonds. *Boccagna*, 450 F.3d at 109. ICBC's head of legal testified that it would be a "stretch" to say there was a market for the bonds. Tr. at 193. But where a "market . . . may be poorly developed or non-existent," *Boccagna*,

---

[7] In a separate motion for a new trial, filed under Federal Rule of Criminal Procedure 33, Hild maintained that certain market pricing for the bonds may have been artificially low because it was influenced by a government cooperator. *See* Def.'s Mot. at 6, Dkt. 235; *see also* Opinion and Order, *United States v. Hild*, No. 19-CR-602 (S.D.N.Y. July 10, 2024) (denying the motion). The Court finds this argument too speculative to conclude that Hild's restitution obligation should be reduced further.

450 F.3d at 116, "other measures of value," albeit not nominal price, "may better serve the . . . compensatory purpose" of the MVRA, *id*. at 109. Accordingly, even if the sale price of $68,373,241.75 does not constitute the "fair market value" of the bonds, it is still an adequate "other measure[] of value": The bonds were sold to the highest bidder for prices that did not drastically differ from those provided by pricing services. *Id*.

The Court therefore agrees with Judge Parker that Hild's restitution obligation to ICBC should be offset by the $68,373,24.75 in sale proceeds.

### 2. Customers Bank's Bond Sales

Hild further contends that he owes less restitution to Customers Bank than recommended by Judge Parker because she calculated his obligation with reference to an "artificial" sale rather than an "actual" one. Hild's characterization is misleading and his argument unpersuasive.

The "artificial" sale that Hild refers to actually occurred. In 2019, Customers Bank sold the bonds to itself pursuant to 11 U.S.C. § 559, which allows certain parties to liquidate collateral in spite of an automatic bankruptcy stay. *See In re HomeBanc Mortg. Corp.*, 945 F.3d at 811. Customers Bank earned $17,156,665.34 from that sale. *See* Dkt. 225-2. In 2020, the bank resold the bonds to a third party, this time earning $15,432,588.37 in proceeds. Even though Customers Bank earned less through the later sale, Hild would benefit from a restitution calculation made with reference to the later sale date because Customers Bank continued to receive substantial coupon payments in 2020. Those coupon payments do not offset his restitution obligation if the Court calculates it with reference to the 2019 sale because Customers Bank no longer possessed the bonds as a result of the fraud.

As a threshold matter, the Court finds that the 2019 sale of the bonds pursuant to 11 U.S.C. § 559 was foreseeable. *Cf. Luis*, 765 F.3d at 1068; *Cean*, 771 F. App'x at 83. As noted above,

"[m]any victims who lose money but subsequently receive other property," such as "collateral securing a loan," "will sell that other property and receive money from the sale." *Robers*, 572 U.S. at 644. That the bank decided to sell the bonds to itself does not change the foreseeability of the sale. Moreover, the evidence does not support Hild's argument that Customers Bank manufactured the sale to itself to obtain a windfall. According to the record, Customers Bank did not initially intend to buy the bonds itself, as it did not invest in this type of bond. *See* Tr. at 139–40, 158. It changed course only after considering the offers it received. *See id.* at 139–40, 147. When it bought the bonds itself, it chose to carry and manage the risks associated with the bonds. *Id.* at 147–48.

In addition, even assuming that the market for the bonds was "poorly developed"—rendering it difficult to identify their "fair market value"—the Court finds that Judge Parker correctly input $17,156,665.34 into her restitution calculation. As part of the 2019 sales process, Customers Bank "engaged Raymond James to market the [bonds] and to try to get [it] the best price that [it] could." Tr. at 139. After considering the offer from the highest bidder, it decided to pay one cent more to buy the bonds itself. *See id.* at 139–40. Under these circumstances, $17,156,665.34 adequately "measures [the] value" of the bonds. *Boccagna*, 450 F.3d at 116.

In sum, the Court agrees with Judge Parker that Hild's restitution obligation to Customer's Bank should be offset by the $17,156,665.34 totaling its proceeds from the bond sales.

## II.    Objections Regarding Evidentiary Support

Turning next to Hild's objections regarding evidentiary support, the Court considers an initial overarching argument, followed by more specific ones.

### A.  General Credibility and Reliability Concerns

Hild broadly objects to Judge Parker's restitution recommendation on the theory that her calculation relied on "non-credible and unreliable submissions." Objections at 5. In particular, he

argues that the lenders' evidence was neither credible nor reliable because they "repeatedly submitted . . . misleading, error-filled, conflicting, incomplete, and late materials to support their claimed losses." *Id*. Upon its independent review of the evidence, the Court finds this contention unpersuasive.

A court need only resolve "dispute[s] as to the proper amount . . . of restitution" "by the preponderance of the evidence." 18 U.S.C. § 3664(e). The "procedures employed to resolve such disputes are within the district court's discretion so long as the defendant is given an adequate opportunity to present his position." *United States v. Sabhnani*, 599 F.3d 215, 258 (2d Cir. 2010); *see United States v. Simmons*, 544 F. App'x 21, 24 (2d Cir. 2013). Relatedly, a sentencing court "is entitled to broad discretion" when "assess[ing] . . . the credibility of witnesses" and their submissions. *United States v. Zagari*, 111 F.3d 307, 330 (2d Cir. 1997). In line with this discretion, courts have repeatedly found that the Government satisfies its burden of proof where a witness provides specific statements under the penalty of perjury. *See, e.g.*, *United States v. Kinney*, 684 F. App'x 73, 75 (2d Cir. 2017); *United States v. Schwamborn*, 542 F. App'x 87, 88–89 (2d Cir. 2013). Indeed, "in many circumstances, the written statements of counsel or affidavits of witnesses are themselves sufficient to resolve the dispute." *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991); *see also United States v. Kuo*, 620 F.3d 1158, 1167 (9th Cir. 2010) ("[V]ictim affidavits will generally provide sufficient, reliable evidence to support a restitution order."). An affidavit, furthermore, may be sufficient even where a witness provides "no supporting documentation." *Schwamborn*, 542 F. App'x at 89; *see also United States v. Pickett*, 387 F. App'x 32, 36 (2d Cir. 2010) (observing that "[n]othing precludes a court from ordering restitution in the absence of . . . affidavits [from victims]").

Hild had ample opportunity to meaningfully present his positions, which he took full advantage of through numerous filings, oral argument, and cross examination. *See Sabhnani,* 599 F.3d at 258; *Simmons*, 544 F. App'x at 24. Meanwhile, as Judge Parker observed, the victims "contributed hundreds of pages of admissible evidence in the form of billing records, trade confirmations, and sworn declarations." Report at 12. Judge Parker also held an evidentiary hearing lasting approximately four hours, during which the Government, Hild, and Judge Parker each questioned the witnesses. After the hearing, Judge Parker provided the parties yet another opportunity to file letters indicating their positions. *See* Order, Dkt. 222. It is true that some of the victims' calculations changed over time and that some admitted to calculation errors. But Judge Parker was well equipped to "assess[] . . . the credibility of witnesses" and their submissions. *United States v. Zagari*, 111 F.3d 307, 330 (2d Cir. 1997). Having independently reviewed the evidence, so is this Court.

The Court, moreover, finds that the Government's final submission—combined with supporting documentation and testimony—provided evidence that was credible and reliable enough to resolve the disputes by a "preponderance of the evidence." 18 U.S.C. § 3664(e). To the extent it finds that any of Hild's more specific concerns warrant further consideration, it addresses them below.

### B. Carrying Costs and Pre-Petition Interest Evidence

Hild next argues that Judge Parker's restitution calculation should be lower given the inadequate documentary support for Mirae's and ICBC's carrying costs, as well as Mirae's pre-petition interest costs.[8] Specifically, he contends that the charts they offered in support of those

---

[8] As a general matter, courts may exercise their discretion to "award[] prejudgment interest on funds that . . . would have otherwise [been] put to productive use." *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). Relatedly, the lenders had to incur carrying costs as a "direct[] and proximate[] cause," 18 U.S.C. § 3663A(b)(1)(A); *see Gushlak*,

costs were inadequate because they contained errors and were not business records. The Court finds that Government satisfied its burden of proof as to the losses, with the exception of Mirae's $615,000 pre-petition interest costs.

As explained above, supporting documentation is not strictly necessary to establish loss by a "preponderance of the evidence." 18 U.S.C. § 3664(e); *see Schwamborn*, 542 F. App'x at 88; *Pickett*, 387 F. App'x at 36. Specific sworn statements are often sufficient, as are "the written statements of counsel." *Ibanez*, 924 F.2d at 430; *see Kinney*, 684 F. App'x at 75; *Schwamborn*, 542 F. App'x at 88–89. Relatedly, "the MVRA requires only a reasonable approximation of losses supported by a sound methodology." *Gushlak*, 728 F.3d at 196.

Here, Mirae and ICBC provided statements, including sworn statements, supporting their carrying costs figures. In particular, Mirae's general counsel proffered a declaration citing those costs, *see* Troncoso Declaration ¶¶ 3–4, Dkt. 219-1, and a managing director testified to the figure under oath, including about how it was calculated,[9] *see* Tr. at 24–25. In addition, ICBC's head of legal filed an affidavit noting the bank's carrying costs, *see* 2023 Cohen Affidavit ¶ 6, Dkt. 203; 2024 Cohen Affidavit ¶¶ 4–6, Dkt. 218, later testifying under oath to the figure and how it was calculated, *see* Tr. at 181–85. Admittedly, the "chart" offered to help explain ICBC's carrying costs proved to be of limited value because it improperly prorated the costs. *See* Tr. at 192. But

---

728 F.3d at 194–95, of Hild's fraud, and the funds put toward the carrying costs would also have otherwise been put to productive use.

[9] The managing director from Mirae indicated that it used a 3 percent average rate to calculate Mirae's total carrying costs. *See* Tr. at 24. She explained that the 3 percent rate "was a pretty conservative" one given that Mirae used raised capital to finance the bonds and that raising capital would probably require "somewhere between 7 to 12 percent" in interest. *Id.* The Court finds Mirae's calculation of its carrying costs sufficient given that "the MVRA requires only a reasonable approximation of losses supported by a sound methodology." *Gushlak*, 728 F.3d at 196. Hild argues that Mirae did not incur any carrying costs because it financed the bonds with cash on hand. However, as noted, the carrying costs were a "direct[] and proximate[] cause," 18 U.S.C. § 3663A(b)(1)(A); *see Gushlak*, 728 F.3d at 194–95, of Hild's fraud, and the funds put toward the carrying costs would have otherwise been put to productive use, *see Qurashi*, 634 F.3d at 704.

Judge Parker had requested charts to help aid her analysis, *see* Oct. 11, 2023 Order, Dkt. 198; Conference Transcript at 20–21, 28–31, Dkt. 196, and ICBC's witness satisfactorily explained that its improper proration resulted from a misguided effort "to be helpful to the Court," Tr. at 192. Furthermore, this is not a case where a "spreadsheet contain[ing] a number of oddities" provided the only specific support for a recommended restitution award. *United States v. Tsosie*, 639 F.3d 1213, 1222 (9th Cir. 2011).

Considering all the evidence in sum, the Court finds that the Government established Mirae's and ICBC's carrying costs by a "preponderance of the evidence," 18 U.S.C. § 3664(e), ensuring a "reasonable approximation of losses supported by a sound methodology," *Gushlak*, 728 F.3d at 196; *see Rainford*, 110 F.4th at 490.

The same is not true, however, of Mirae's pre-petition interest calculation. Although Mirae's general counsel submitted a declaration stating that it sought $615,000.00 in interest, the Court lacks confidence that the figure is a "reasonable approximation of [the] loss[]." *Gushlak*, 728 F.3d at 196. The record contains no evidence indicating what interest rate was used to calculate the $615,000.00—unlike the calculation of Mirae's carrying costs, which relied on "a pretty conservative" 3 percent rate. Tr. at 24. Compounding this uncertainty is the testimony of Mirae's managing director, who testified to an entirely different calculation. She stated: "I don't have the calculation of the pre-petition interest being computed as 615. In fact, I think that number should be 1,000,208. And that, I can 100 percent calculate and explain." Tr. at 75. She never, however, identified the relevant rate, and while she indicated that she could provide documentation supporting her calculation, *see id.* at 75–76, she failed to do so. Judge Parker, moreover, recommended denying Flagstar restitution for interest because it failed to "provide[] . . . a

17

methodology for its calculation of interest." Report at 7.[10] Mirae's calculation is likewise inadequately supported.

Accordingly, the Court reduces the calculation of restitution owed to Mirae recommended by Judge Parker by $615,000.00.

### C. Legal Fees and Settlement Award Evidence

Hild also argues for decreased restitution obligations due to evidentiary issues regarding legal fees and how those issues relate to the credit he is due for settlement awards.

#### 1. Offsets to Flagstar and ICBC's Losses

Judge Parker recommended reducing the restitution owed to Flagstar and ICBC by the amount of settlement money they received, less the legal fees they incurred in reaching those settlements. Hild asserts that because there is no documentary support for those legal fees, his restitution obligation should instead be reduced by the *gross* amount of the settlement awards. Stated differently, he maintains that his restitution obligation should be further offset by the legal fees, respectively totaling $2,628,124.00 and $5,500,000.00.

In accordance with 18 U.S.C. § 3664, a court must reduce a defendant's restitution obligation "by any amount later recovered as compensatory damages for the same loss by the victim in" a civil proceeding. 18 U.S.C. § 3664(j)(2). Moreover, as noted above, defendants bear

---

[10] Relatedly, the Court agrees with Judge Parker's recommendation that it not award Flagstar approximately $4.4 million in interest. A senior vice president at Flagstar submitted an unsworn declaration, incorrectly titled an "affidavit," citing that figure. *See* Declaration ¶ 9, Dkt. 144-3. The Court accordingly has no "written statements of counsel or affidavits of witnesses" that would help "resolve the dispute" at to the $4.4 million. *Ibanez*, 924 F.2d at 430. At the hearing, moreover, the senior vice president provided no insight into how the figure was calculated. He merely observed what the spreadsheet stated. *See* Tr. at 110–11. In addition, Flagstar repeatedly declined requests to further substantiate the number.

The Court further agrees with the recommendation that it decline to award Flagstar legal fees or fees paid to Consilio and Recon Management Group. Again, Flagstar submitted an unsworn declaration noting those fees, and a representative later clarified that the fees were paid for non-compensable expenses: legal fees connected to the sale of the bonds, work pertaining to a Securities and Exchange Commission ("SEC") subpoena, valuation work, and background investigations on Live Well and Hild. *See* Tr. at 110–11; Marsh Declaration ¶ 13, Dkt. 217.

the burden "[w]ith respect to requests . . . for credits against their restitution obligations." *Smathers*, 879 F.3d at 460. They generally bear this burden "whether the payments to the victim were made by the defendant himself or were made by other persons." *Id.* at 460–61. Indeed, numerous courts have concluded that defendants bear the burden of proof with respect to civil settlements, including ones to which they were not a party. *See, e.g.*, *id.* at 461; *Elson*, 577 F.3d at 733–34. Once again, Hild "unquestionably has the strongest incentive to establish that he is entitled to a reduction of his . . . restitution obligation." *Smathers*, 879 F.3d at 461. In addition, "as the government was not a party to" the settlements, it "has no greater access" than Hild to information on the settlements. *Id.* Hild thus bears this burden as to the $2,628,124.00 and $5,500,000.00.

Hild failed to meet this burden. Although he suggests that the identified legal fees were inflated—and, in turn, implies that the lenders received more than they represented—he offers no support for his suggestion. For example, when cross examining Flagstar's and ICBC's witnesses, Hild failed to elicit testimony indicating that the identified legal fees awarded as part of the civil settlements were inflated. Most importantly, in citing the lack of evidentiary support for the identified legal fees, Hild seeks to invert the burden of proof regarding credits against a defendant's restitution obligation. *See Smathers*, 879 F.3d at 460.

Even if it were the Government's burden to establish the offset from the settlement proceeds here, however, the Court finds that it met that burden. *See generally, e.g.*, *Kinney*, 684 F. App'x at 75; *Schwamborn*, 542 F. App'x at 88–89 (describing ways the Government can meet its burden). In addition to noting the figure in an explanatory spreadsheet, Flagstar's senior vice president explained the figures under oath. *See* Tr. at 108–09.[11] ICBC's head of legal, meanwhile, provided an affidavit attesting to the amounts. *See* 2023 Cohen Affidavit ¶ 10.

---

[11] The Court observes that this testimony provided went further than merely observing what the supporting spreadsheet noted. He explained that ICBC "had to pay attorneys' fees" after the "negotiated payment" and that a

The Court thus will not offset his restitution obligations to Flagstar and ICBC by $2,628,124 and $5,500,000, respectively, more than recommended.[12]

### 2. Offsets to the Estate's Losses

Hild's related argument that the Court must offset his restitution obligation to the Live Well Bankruptcy Estate by the amount of its settlement awards fares no better.

The MVRA entitles a victim to reimbursement "for expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Also, as noted, a court must reduce a defendant's restitution obligation "by any amount later recovered as compensatory damages for the *same loss* by the victim in" a civil proceeding. 18 U.S.C. § 3664(j)(2) (emphasis added).

In its filings reviewed by Judge Parker, the Estate sought $253,850.25 in legal fees and related expenses incurred in support of Hild's criminal prosecution; meanwhile, the record indicates that it obtained settlement money. *See* Tr. at 202–03. Yet Hild failed to meet his burden, *see Smathers*, 879 F.3d at 460–61, to demonstrate that the settlement money compensated the Estate for "same loss," 18 U.S.C. § 3664(j)(2), identified: the legal fees and related expenses.

Regardless, Bryan Hall, an attorney representing the bankruptcy trustee of Live Well, testified on direct examination that the settlement related to matters other than the Estate's participation in the investigation and prosecution. *See* Tr. at 202–03. He testified to the same fact even more explicitly on cross. *See* Tr. at 207.

---

"smaller" figure was "what the bank actually received to be able to apply towards the [loan] balance." Tr. at 109. Accordingly, the testimony regarding settlement and attorneys' fees stands in contrast to the senior vice president's testimony regarding the $4.4 million in purported interest owed, for which the Court has declined to award restitution. *See infra* note 10.

[12] Hild also appears to argue that Judge Parker erred in recommending that the Court award Flagstar legal fees. This argument is difficult to comprehend. Judge Parker did not recommend awarding Flagstar any legal fees. In fact, she explicitly declined to do so. *See* Report at 9.

The Court therefore will not offset Hild's restitution obligation to the Estate by any settlement money it received.

### 3. Mirae's and the Estate's Fee Losses

Hild further maintains that Judge Parker erroneously recommended restitution for certain legal and related fees incurred by Mirae and the Estate. The Court finds that he owes $13,778.29 more than recommended to Mirae and $139,271.57 less than recommended to the Estate.

As to Mirae, Hild argues that Judge Parker should not have recommended awarding any legal fees because Mirae failed to identify which subset of the fees were compensable. He also asserts that she failed to detail which billing entries totaled the $23,310.00 calculation, rendering her recommendation "unreviewable." Objections at 7.

As noted, the MVRA entitles a victim to restitution for "necessary . . . expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4); *see United States v. Maynard*, 743 F.3d 374, 380–81 (2d Cir. 2014). A victim may incur those expenses only through participation in the *criminal* investigation, prosecution, or proceeding, and not, for example, through participation in a related SEC investigation. *See Lagos*, 584 U.S. at 581; *United States v. Afriyie*, 27 F.4th 161, 173 (2d Cir.), *cert. denied*, 143 S. Ct. 326 (2022). Moreover, where a billing entry references multiple tasks without specifying the time spent on each one and only some are compensable, the court may employ "a reasonable solution concerning th[o]se commingled billing items." *Afriyie*, 27 F.4th at 172. One such solution, which the Court will adopt, is to subtract the full billing amount for entries that commingle compensable and non-compensable fees. *See United States v. Avenatti*, No. 19-CR-373, 2022 WL 452385, at *10 (S.D.N.Y. Feb. 14, 2022), *aff'd*, 81 F.4th 171 (2d Cir. 2023). At the same time, a court may not otherwise "cap" a restitution amount where the evidence

indicates a victim is entitled to more. *See United States v. Reifler*, 446 F.3d 65, 133 (2d Cir. 2006).

Doing so would "plainly contravene[] the MVRA's requirement that any restitution order

compensate the victims in full." *Id.*; *see United States v. Schwamborn*, 467 F. App'x at 38.

Although Mirae previously declined to specify the compensable legal expenses among the

billing records, Judge Parker, in the face of the billing records, could not simply ignore that Mirae

incurred some compensable ones. *See Reifler*, 446 F.3d at 132; *Schwamborn*, 467 F. App'x at 38.

The Court therefore finds no error in Judge Parker's efforts to parse through the billing records.

Nonetheless, because the Court could not discern which expenses Judge Parker deemed

compensable, it found more specific fact finding necessary. *See United States v. Johnson*, 378 F.3d

230, 233–34 (2d Cir. 2004); *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).

The Court thus ordered the Government, on behalf of Mirae, to submit revised records

clarifying which billing entries pertain only to "expenses incurred during participation in the

[criminal] investigation or prosecution of the offense or attendance at proceedings related to the

offense." 18 U.S.C. § 3663A(b)(4); *Lagos*, 584 U.S. at 581; *Afriyie*, 27 F.4th at 173. The revised

records were to exclude, for example, billing pertaining to any related SEC investigation or

litigation. The Court has reviewed those records, filed on May 22, 2024. It finds that all the

expenses included in them, totaling $37,088.29, constitute "necessary . . . expenses incurred during

participation in the investigation or prosecution of the offense or attendance at proceedings related

to the offense." 18 U.S.C. § 3663A(b)(4). Accordingly, because Hild owes Mirae $37,088.29 in

restitution for legal fees rather than the recommended $23,310.00, the Court increases his

calculated restitution obligation by $13,778.29.

As to the Estate, Hild argues that Judge Parker failed to deduct from her $253,850.25

calculation certain non-compensable legal fees, including those incurred with respect to unrelated

real estate matters and a related SEC investigation. Because the Court agreed that some of the billing entries appeared to include non-compensable fees, the Court twice ordered the Government, on behalf of the Estate, to submit revised records. *See* 18 U.S.C. § 3663A(b)(4); *Lagos*, 584 U.S. at 581; *Afriyie*, 27 F.4th at 173. In its final submission, the Estate reduced the expenses sought to $115,370.68. After reviewing the revised records and finding three minor errors, the Court concludes that the Estate is entitled to all but $792.00 of those expenses.[13]

Accordingly, rather than the recommended $253,850.25 in compensable fees, Hild owes the Estate $114,578.68, a "reasonable approximation of [its] losses." *Gushlak*, 728 F.3d at 196.

## CONCLUSION

For the foregoing reasons, Hild is hereby ordered to pay a total of $45,715,100.72 in restitution—a figure the Court concludes is "a reasonable approximation of losses supported by a sound methodology." *Gushlak*, 728 F.3d at 196. The Court modifies Judge Parker's recommendation that Hild pay $46,455,594.00 by reducing the amount of restitution owed to Mirae and the Estate. More specifically, it reduces the recommended restitution owed to Mirae by $601,221.71, the total of $615,000.00 in claimed pre-petition interest minus the $13,778.29 increase in compensable legal fees. It also reduces the recommended restitution owed to the Estate by $139,271.57 in claimed legal and related expenses. The names, addresses, and specific amounts owed to each victim are set forth below:

---

[13] Two of the errors relate to billing entries for August 22, 2019 and May 3, 2021 in which the Estate failed to exclude from its calculation tasks it acknowledged were non-compensable. One error relates to a billing entry from October 7, 2019 for fees that are excludable under *Avenatti*, 2022 WL 452385, at *10.

| Name | Address | Amount |
|------|---------|--------|
| Flagstar Bank | c/o Joseph Shannon, Esq.<br>Bodman PLC<br>1901 St. Antoine Street<br>6th Floor at Ford Field<br>Detroit, MI 48226<br>313-393-7549<br>jshannon@bodmanlaw.com | **$13,364,357.00**<br><br>This figure represents the total loan balance owed to Flagstar ($66,298,850) minus the bond sale proceeds ($35,752,801), coupons received ($709,816), and settlement amounts received ($16,471,876). |
| Industrial and Commercial Bank of China | c/o William Barbera, Esq.<br>Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, NY 10022<br>914-589-8550<br>william.barbera@srz.com | **$17,795,124.41**<br><br>This figure represents the total loan balance owed to ICBC ($138,299,412.30) plus carrying expenses ($4,316,776.08) minus the bond sale proceeds ($68,373,241.75), coupons received ($39,947,822.22), and settlement amounts received ($16,500,000). |
| Mirae Asset Securities (USA), Inc. | c/o Al Troncoso, Esq.<br>General Counsel<br>810 7th Ave 37th Floor<br>New York, NY 10019<br>201-563-0246<br>al.troncoso@miraeasset.us.com | **$6,796,248.56**<br><br>This figure represents the total loan balance owed to Mirae ($104,201,134) plus carrying expenses ($5,853,569.34), and claimed legal fees ($37,088.29) minus the bond sale proceeds ($46,915,902.52), coupons received ($45,182,624.55), and settlement amounts received ($11,197,016). |
| Customers Bank | c/o Caitlin Hull, Esq.<br>Dorsey & Whitney LLP<br>919 Third Avenue<br>New York, NY 10022<br>612-492-6773<br>hull.caitlin@dorsey.com | **$7,644,792.04**<br><br>This figure represents the total remaining principal due to Customers Bank ($24,814,287) plus prepetition interest ($218,633.09), carrying expenses ($36,601.07), and legal expenses ($57,180.80) minus proceeds from the sale of the bonds ($17,156,665.34) and coupon payments ($325,244.58). |
| Live Well Financial, Inc. | c/o Michael Schaedle, Esq<br>Counsel to the Chapter 7 Trustee<br>Blank Rome LLP<br>One Logan Square<br>130 North 18th Street<br>Philadelphia, PA 19103 | **$114,578.68**<br><br>This figure represents the professional fees ($93,865.58) and other reimbursable expenses ($20,713.10) incurred in the Trustee's support of Hild's prosecution. |

I.    **Joint and Several Liability**

Restitution is joint and several with the following defendants in the following cases: *United States v. Eric Rohr*, No. 19-CR-595 and *United States v. Darren Stumberger*, No. 19-CR-608. The defendant's liability to pay restitution shall continue unabated until either the defendant has paid the full amount of restitution ordered herein, or every victim noted above has recovered the total amount of each loss from the restitution paid by the defendant and all co-defendants ordered to pay the same victims.

II.    **Apportionment Among Victims**

Pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid. Restitution shall be paid to the victims identified above, on a pro rata basis, whereby each payment shall be distributed proportionally to each victim based upon the amount of loss for each victim, as set forth more fully above.

III.    **Schedule of Payments**

Pursuant to 18 U.S.C. § 3664(f)(2), in consideration of the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the defendant; and any financial obligations of the defendant; including obligations to dependents, the defendant shall pay restitution in the manner and according to the schedule that follows:

In the interest of justice, restitution will be payable in installments pursuant to 18 U.S.C. § 3572(d)(1) and (2). The defendant will commence monthly installment payments of at least 20 percent of the defendant's gross income payable on the fifteenth day of each month, immediately upon entry of this judgment.

While serving the term of imprisonment, the defendant shall make installment payments toward restitution and may do so through the Bureau of Prisons' Inmate Financial Responsibility Plan. Any unpaid amount remaining upon release from prison will be paid in installments of at least 20 percent of the defendant's gross income on the fifteenth day of each month.

This schedule is without prejudice to the Government taking enforcement actions, pursuant to 18 U.S.C. § 3613, to the extent warranted.

## IV.    Payment Instructions

The defendant shall make restitution payments by certified check, money order, or online. Instructions for online criminal debt payments are available on the Clerk of Court's website at https://nysd.uscourts.gov/payment-information#PaymentofCriminalDebt. Checks and money orders shall be made payable to the "SDNY Clerk of Court" and mailed or delivered to: United States Courthouse, 500 Pearl Street, New York, New York 10007 - Attention: Cashier, as required by 18 U.S.C. § 3611. The defendant shall write his/her name and the docket number of this case on each check or money order.

## V.    Change in Circumstances

The defendant shall notify, within 30 days, the Clerk of Court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, 86 Chambers Street, 3rd Floor, New York, New York 10007 (Attn: Financial Litigation Program) of (1) any change of the defendant's name, residence, or mailing address or (2) any material change in the defendant's financial resources that affects the defendant's ability to pay restitution in accordance with 18 U.S.C. § 3664(k).

## VI.    Term of Liability

The defendant's liability to pay restitution shall terminate on the date that is the later of 20 years from the entry of judgment or 20 years after the defendant's release from imprisonment, as provided in 18 U.S.C. § 3613(b). Subject to the time limitations in the preceding sentence, in the event of the death of the defendant, the defendant's estate will be held responsible for any unpaid balance of the restitution amount, and any lien filed pursuant to 18 U.S.C. § 3613(c) shall continue until the estate receives a written release of that liability.

SO ORDERED.

Dated:    September 23, 2024
          New York, New York

Ronnie Abrams
United States District Judge